IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WEIH STEVE CHANG
AND GORDON GENE SMITH,
INDIVIDUALLY AND AS TAXPAYERS,
and on behalf of a Class of others similarly
situated,

        Plaintiffs,

        v.

KATHARINE SULLIVAN, OFFICE ON
VIOLENCE AGAINST WOMEN,

ASHLEY GORODETZER, Delaware
Volunteer Legal Services,

STEPHANIE HAMILTON, City of
Wilmington Police Department,

JOELLE HITCH, Delaware Family Court,

Unnamed OVW Grantees and VAWA
Coordinators, Private and Governmental,

in their individual and official capacities,
jointly and severally,

        Defendants.

Case: 1:19−cv−01241
Assigned To : Chutkan, Tanya S.
Assign. Date : 4/29/2019
Description: Pro Se Gen. Civ. (F−DECK)

**Non-Jury Trial Demanded**

## VERIFIED CLASS ACTION COMPLAINT

Plaintiff, Weih Steve Chang ("Chang") brings his Verified Class Action

Complaint against defendants Katharine Sullivan, Ashley Gorodetzer, Stephanie

Hamilton, Joelle Hitch, and other unnamed individuals hereinafter referred to

RECEIVED

APR 2 9 2019

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

collectively as "Defendants" seeking declaratory and injunctive relief as well as damages on his behalf and on behalf of those similarly situated and alleges, upon personal knowledge or other information obtained upon investigation by him and his counsel that he believes to be true, as follows:

## PREFACE

1. This civil action challenges the constitutionality of the enactment of the Violence Against Women Act (United States Code at 34 U.S. Code § 12291 *et. seq.,* hereafter, "VAWA" or the "Act"), as subsequently amended and also the rules, regulations and policies under which it is enforced. Plaintiffs allege that Congress exceeded its authority when it enacted a "Separate but Equal" domestic violence law which it titled as the "Violence Against Women Act" and allege further that the rules, regulations and administrative procedures employed to enforce the Act have been and continue to be unconstitutionally discriminatory.

2. This civil action also challenges the constitutionality of the cooperative federalism, which constitutes the enforcement mechanism of the Act. Defendants employed and continue to employ the principles of cooperative federalism in administering the Act. In so doing, Defendants deliberately disregard to the rights of the accused or to the rights of the actual victims. Defendants, among other things, deprived Plaintiffs' of due process protection, imposed taxation without representation, and levied excessive fines upon domestic violence victims in order to

2

enable themselves to claim that the program was successful when in fact, the unfair and biased enforcement of the Act promoted a false narrative under which innocent persons were prosecuted and penalized without the benefit of due process or equal protection. Plaintiffs seek judicial review of the Act itself and its method of enforcement under the Administrative Procedure Act and the 10th Amendment of the Constitution.

3. Glaringly absent from the Act are due process protections, right to counsel, and other nondiscriminatory provisions designed safeguard equal rights and due process. Plaintiffs therefore rely upon the 4th, 5th, 6th, and 14th Amendments of the Constitution of the United States and seek compensatory damages because Defendants acted as state actors and agents or representatives of a federal agency. [1]

4. Plaintiffs seek compensatory damages under the Tucker Act because Defendants acted as agents or representatives of a federal agency in federal taxation and federal enforcement of the "Separate but Equal" Act.

5. Plaintiffs also seek compensatory damages under *Bivens* as a common law cause of action because Defendants acted as agents or representatives of a federal agency. Defendants conducted systemic gender profiling and malicious prosecutions of Plaintiffs, both private and governmental, which resulted in unlawful seizures of Plaintiffs' properties and other interests in violation of the 4th, 5th, 6th, and the 14th

---

[1] Glaringly oppressive is Section 13981 of the Act which unconstitutionally purports to give females a civil rights remedy against private actors. See *USA v. Morrison*.

Amendments.

6. VAWA, as presently enacted and enforced is discriminatory in letter and in spirit. The term "domestic violence" as used therein is virtually interchangeable with the term "heterosexual men's violence against women" and it has been enforced in a manner consistent with such discriminatory definition.

7. Plaintiffs do not argue for or against the proposition that "Congress has the power to legislate with regard to activity that, in the aggregate, has a substantial effect on interstate commerce."[2]  Instead, Plaintiffs assert that Congress overstepped constitutional boundaries prohibiting discriminations based on race, color, sex, and national origin, when it enacted a "Separate but Equal" law to regulate sexual assaults and domestic violence using its powers to regulate interstate commerce.

**THE PARTIES**

**Plaintiffs**

8. Plaintiff Weih Steve Chang ("Chang") is and at all relevant times mentioned herein was, a citizen of the United States and residing in Hockessin, Delaware. By information and belief, Chang was included as a perpetrator of domestic violence in OVW's Biennial Reports to Congress on the Effectiveness of Grant Programs under the Violence against Women Act ("Biennial Reports"), when, in fact, Chang has been a victim of domestic violence.

---

[2] See *United States v. Morrison* (529 U.S. 598)/Dissent by Justice Souter.

9. Plaintiff Gordon Gene Smith ("Smith") is a citizen of the United States currently residing in Port Orange, Florida. Upon information and belief, Smith was included as a perpetrator of domestic violence in the Biennial Reports, when, in fact, Smith was falsely accused and arrested.

10. The number of class plaintiffs can be reasonably assessed mathematically from the Biennial Reports to have exceeded a critical mass of law-abiding taxpayers who during some point of their lifetime were or will be discriminatorily subjected to the full force of the Act.

11. According to the National Coalition Against Domestic Violence, 1 in 4 women and 1 in 7 men have been victims of severe physical violence by an intimate partner in their lifetime. Yet, the statistics compiled in the enforcement of the Act reveal that it has been enforced in a grossly disproportionate manner, favoring women excessively over men.

12. For each ten thousand unique female victims of physical violence included in the Biennial Reports, thousands of male victims of physical violence, like Chang, were excluded solely because of their gender.

13. The Biennial Reports also included persons who were not victims of domestic violence as the beneficiaries of federal grants even when their accused perpetrators, like Smith, were found to be innocent.

## Defendants

14. Defendant the Office on Violence Against Women ("OVW") is a federal agency established under the provisions of the Act. Legislation passed in 2002 made OVW a permanent part of the Department of Justice with a Presidentially-appointed, Senate-confirmed Director.

15. Defendant Katharine Sullivan ("Sullivan") is at all relevant times mentioned herein the acting director of OVW.

16. Under the scheme of Defendants' cooperative federalism and pursuant to Delaware's Title 11 Chapter 87 Delaware Defendants mentioned herein are the enforcing agents and representatives of Defendants OVW and Sullivan.

17. The City of Wilmington is a municipal corporation, organized and existing under the laws of the State of Delaware and is engaged in various municipal activities including the operation of a municipal police force, the Defendant City of Wilmington Police Department ("WPD"). Defendant Stephanie Hamilton ("Hamilton") is a civilian member of the WPD and serves as its OVW-funded VAWA coordinator, which is defined as the administrative overseer of VAWA enforcement. Defendant Adrienne Owen ("Owen")[3] of Delaware State Police acted in the same capacity.

18. Defendant Ashley Gorodetzer was, at all relevant times hereto, a staff

_____

[3] Owen has dual roles of a law enforcement officer and a VAWA coordinator, while Hamilton of WPD is a VAWA coordinator.

attorney of Delaware Volunteer Legal Services ("DVLS"), an OVW grantee, acting

as a private prosecutor for VAWA in the Family Court of Delaware. Defendant

James McGiffin, a staff attorney of Community Legal Aid Society, Inc. ("CLASI"),

acted in the same capacity.

19. Defendants Joelle Hitch ("Hitch") and Louann Vari ("Vari") are, at all

relevant times hereto, employed by the Family Court of Delaware, an OVW grantee,

which has exclusive jurisdiction over VAWA enforcement cases.

20. Unnamed co-conspirators with the defendants include, but are not limited

to, OVW-funded VAWA coordinators employed by the Family Court of Delaware,

OVW-funded VAWA coordinators employed by the state attorney general's office,

which acted as a government prosecutor of VAWA enforcement in the Family Court

of Delaware, and OVW-funded VAWA coordinators employed by non-profit OVW

grantees

21. All Defendants participated in cooperative federal enforcement actions of

financing and conducting the investigation, private and governmental prosecutions

of Plaintiffs Chang and Smith by, among other things, falsifying police reports,

administering false affidavits, and signing orders of unlawful seizures of properties.

## JURISDICTION AND VENUE

22. This Court has jurisdiction over this action under the provisions of 28

U.S.C. §§1331, 1341 & 1343 because it is filed to obtain declaratory relief,

injunctive relief, and compensatory damages for the deprivation, under color of a

federal law, of the rights and privileges of citizens of the United States secured by

the 4th, 5th, 6th, 10th, and 14th Amendments of the Constitution and federal law

pursuant to 42 U.S.C. § 1983.

23. Venue is proper under 28 U.S.C. § 1391(b)(2) because Congress enacted

VAWA in this judicial district.

24. Venue is proper under 28 U.S.C. § 1391(b)(2) because an estimated $474

million dollar collected through federal taxation were appropriated to and

administered by OVW in this judicial district.

25. Venue is proper under 28 U.S.C. § 1391(b)(2) because OVW defines

campus dating violence, campus sexual assaults, and domestic violence as "National

Crimes" and has engaged in a cooperative federalism in which the federal, state and

local governments, university administrations, and OVW-funded nonprofits interact

cooperatively and collectively to enforce the Act, OVW's policies, rules, and

regulations.  A substantial part of the acts performed in this cooperative federalism

occurred in this judicial district. These acts include, but are not limited to, making

rules, issuing regulations, operating under administrative procedures, approving

grant applications, and regulatory oversight of grantees.

26.  Venue is proper because the evil spirit of the "Separate but Equal" Act has

metastasized and has impaired the fair and impartial administration of justice by the

federal judiciary for the District of Delaware. Under Defendant OVW's cooperative federalism, Delaware legislatively requires a federal judge and a federal prosecutor to participate in the state's VAWA implementation as members of a state agency in charge of VAWA enforcement. Furthermore, numerous federal judges of the district personally donated to the designated private prosecutors and grantees of Defendant OVW, which creates a clear conflict of interest or, at the very least, the appearance of a conflict.

## LEGAL FRAMEWORK

### VAWA and other "Separate but Equal" Laws

27. VAWA is a part of the Violent Crime Control and Law Enforcement Act of 1994 ("Crime Bill"). The chief architect of the Crime Bill announced that the "predators on our streets" were "beyond the pale" and that Congress has "an obligation to cordon them off from the rest of society."

28. The "Separate but Equal" component of the Crime Bill was written by its authors using false gender stereotypes analogous to other laws, such as drug laws, the based on a scientifically false theory that chemically identical drugs identified with black users (crack cocaine) must be treated as if it were 100 times as villainous as powder cocaine, the drug of choice for white users.

29. Using similar logic, the authors of the Crime Bill concerned themselves with "male predators on college campus" and "male predators at homes" when

enacting the [men's] Violence Against Women Act.

30. By plain reading, VAWA followed the ugly footprint of the *Chinese Exclusion Act* and *Montgomery City Code* by overtly targeting a specific class of persons separately.

31. History repeats itself. The United States of America was founded over a dispute of "Separate but Equal" law, also known as "taxation without representation".  The colonists did not object that the taxes were too high; taxes were actually low. They objected to a "separation" in which that they had no representation in the British Parliament, and thus no voice concerning legislation that affected them. Meanwhile the Parliament saw itself as the supreme lawmaking authority throughout all British possessions and thus entitled to levy any tax without colonial approval. The Parliament considered colonists "virtually" represented therefore already having an "equal" representation.

32. This dispute over a "Separate but Equal" taxation law had an inherent property interest and the founders desired a self-governing government of "We the People" of equals, i.e. equal taxation for equal representation and equal protection under the law.

33.   For the longest time African Americans were treated as properties instead of citizens. Slaves don't pay taxes. For free Blacks, on the other hand, a few

states exempted them from paying certain taxes. [4]

34. The common theme of these overarching "freedom tax" policies for free Blacks is opposite to that of the colonists in American Revolution. Whites wanted NO representation for free Blacks in government and consciously offered "freedom tax" to maintain a "Separate but Equal" government. At least, the white proponents of "freedom tax" seemed to recognize the inherent property interest for free Blacks by offering a preemptive "Separate but Equal" taxation scheme.

35. American Suffragists were not as lucky as free Blacks with regard to their taxes. The law then separated women from men away from the voting booths but collected taxes from women equally from men. Relying on "no taxation without representation" American Suffragists asserted that their property interests were violated under the "Separate but Equal" taxation scheme.

36. It must be noted that "Separate" enforcement of a seemingly "equal" law had the same effect of a "Separate but Equal" law. An 1880 ordinance of the city of San Francisco required all laundries in wooden buildings to hold a permit issued by the city's Board of Supervisors. In *Yick Wo v. Hopkins*, the court concluded "if it [the ordinance] is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal

---

[4] For example, a few Maryland counties exempted free Blacks from paying school taxes for schools their children could not attend, and North Carolina exempted free Blacks in the entire state from paying any school tax. Tennessee's 1834 constitution exempted "[a]ll free men of color" from paying the poll tax.

justice is still within the prohibition of the Constitution." *Yick Wo*'s property interest was deprived by the "Equal Law Enforced Separately" scheme.

37. When VAWA was first enacted in 1994, the stated goal of Congress was to "deter and punish violent crimes against women."[5] No mention was made of any other violent crimes committed in intimate relationships other than those committed by men against women.

38. The very name of the Act (the Violence Against Women Act) which purports to protect only one gender and, leaves out men, gays and other sexual preferences shows the intentional disregard of fundamental fairness and equal representation.

39. The Act created a gender-activated private right of action for allegedly abused women to the exclusion of other genders and sexual preferences. The Act delineates a *prima facie* dividing line of "us versus them" and was patently discriminatory and unconstitutional when enacted.

40. The purported reason for this federally-sanctioned gender discrimination is belied by federally collected statistics from local law enforcement agencies which conclusively support the fact that domestic violence in intimate relationship settings are not limited to violence against women.   Domestic or dating violence (perpetrated by heterosexual women) against men, and domestic or dating violence

---

[5] H.R Rep. No. 103-395, at 26 (1994). See Pub. L. 103-322 (Sept. 13, 1994).

in LGBTQ communities does occur and is prevalent in many communities.

41. In the years since its enactment, the Act has changed both through judicial action and through amendment.  In 2000, the Supreme Court in *United States v. Morrison,* 529 U.S. 598 (2000*),* addressed the question of whether Congress has the authority to enact portions of the Violence Against Women Act of 1994 under either the Commerce Clause or the Fourteenth Amendment.  The Court ruled that neither the Commerce Clause nor the Fourteenth Amendment contained sufficient authority for Congress to provide a civil remedy, since the Act did not regulate an activity that substantially affected interstate commerce nor did it redress harm caused by the state.

42. Despite the decision in *Morrison*, Defendant OVW continues to assert on its website and in its brochures that campus dating violence, campus sexual assault, and domestic violence are federally recognized "National Crimes."

43. In 2013, Congress at last took notice of the absence of equal protection in VAWA.  Thus, 19 years after the enactment of VAWA and 14 years after *Morrison*, it amended the Act with the 2013 Nondiscrimination Provision. Defendant OVW claimed that "this groundbreaking provision will ensure that lesbian, gay, bisexual and transgender (LGBT) victims of domestic violence, sexual assault, dating violence and stalking are not denied services under VAWA, on the basis of their sexual orientation or gender identity..." Ironically, and despite the language of the

13

2013 amendments, nothing changed for heterosexual males. VAWA affords them no protections and the practices and procedures heretofore employed under the Act have not changed. The discriminatory nature and effect of the Act, even as amended, remains the same. Defendants' *modus operandi* and the *de jure* and *de facto* gender bias enshrined in the Act and its enabling regulations and procedures directed against heterosexual men remains the same.

44. Defendants continue to unjustly and illegally discriminate between persons in similar circumstances based solely on their gender. The effect of the Act and its enforcement, paid for with federal taxation, constitutes taxation without representation.

### Cooperative Federalism of the Act

45. In *Morrison*, the court concluded that domestic violence and campus sexual assaults are inherently local crimes under state sovereignty, which do not affect interstate commerce. There was therefore no basis for federal intrusion or a federally created civil right.

46. The federal enforcement mechanism devised under the Act is to use a gender-neutral federal taxation to provide incentives to states and local governments and non-profits as vehicles of governmental and private prosecution of violence against women as "National Crimes". More local prosecutions mean more federal incentives.

47. As a result, a whole new, publicly funded infrastructure sprang into existence, dedicated to prosecuting alleged crimes against women to the exclusion of all other crimes of the same nature. The result is that a previous state function was converted into a partially privatized, federally funded program, which is inherently unfair and biased.

48. By choosing to nationalize the prosecution of one tier of the domestic abuse problem affecting only one gender/class of accusers, Defendants intentionally discriminated against other persons affected by domestic violence, both by denying them the same rights and privileges granted to women and also by treating them unfairly in the prosecutorial process by skewing the resources available in favor of female accusers, regardless of the merits of their claims.

49. Under the Act, Defendant Sullivan and her agency has funded a national network of VAWA coordinators. They act as administrative overseers within local governments and universities and have foundationally modified traditional, local police procedures and judicial proceedings for the purpose of discriminatorily enforcing local laws under the Act.

50. Under the paradigm of cooperative federalism Congress has in the past created delivery systems for federally sponsored programs such as medical assistance ("MA") or the former Aid to Families with Dependent Children ("AFDC"). In those programs a participating state's program is financed largely by

the Federal Government, on a matching fund basis, subject to federal laws and the Constitution of the United States.

51. In contrast to MA or AFDC where a recipient's eligibility is based on poverty or medical conditions, VAWA determines a recipient's eligibility based solely on a recipient's gender and presumes they are victims of a "National Crime" committed by a person of the opposite gender. Defendants routinely hold the accused to be guilty until proven innocent and heavily subsidize his prosecution without the due process protection usually afforded to defendants committing the worst of offenses.

52. The gender-based "guilty until proven innocent" scheme, deliberate deprivation of due process for gender-based program eligibilities, and intrusion of a federal agency upon state sovereignty under the "Separate but Equal" law violates the 4th, 5th, 6th, 10th, and 14th Amendments.

### Civil Lynching - Local Enforcement Mechanism of the Act

53. A Lynch law proceeding is a political process, not a judicial one. In a typical Lynch law proceeding, a trial by a mob was assembled and the mob appointed itself with extrajudicial authority as a trier of fact and law. The accused is pre-determined to be guilty of supposed crimes. Due process protection of the accused is not required prior to, during, or after a summary execution.

54. The enforcement mechanism of the "Separate but Equal" law on university

campuses and in family courts inherited the very extrajudicial characteristics of a

Lynch Law, i.e. by-passing the due course of law for the purpose of depriving

certain classes of accused persons of due process protection.

55. In 1893, Ida B. Wells investigated 800 deaths by lynching published

earlier by the Chicago Tribune in January 1892 and she published the purported

crimes by Negroes murdered by the lynch mobs: 269 for rape (violence against

white women), 253 for murder, 44 for robbery, 37 for incendiarism, 4 for burglary,

27 for race prejudice, 13 for quarreling with white men, 10 for making threats, 7 for

rioting, 5 for miscegenation, 32 for no reason given.

56. By Wells' accounting accusations of violence against white women

alleged by white women were the number one driving force behind lynching.

57. Wells further wrote: "[t]he world affects to believe that white womanhood

and childhood, surrounded by their lawful protectors, are not safe in the

neighborhood of the black man, who protected and cared for them during the four

years of civil war. The husbands, fathers and brothers of those white women were

away for four years, fighting to keep the Negro in slavery, yet not one case of

assault has ever been reported!"

58. Avoiding the due course of law is the signature of lynching.  In the

infamous case of Emmett Till, his accuser, Carolyn Bryant, a white woman, never

reported the supposed crimes to local law enforcement. Instead Bryant sought

private prosecution extra judicially.

59. Defendants Sullivan and OVW deliberately and effectively transformed local enforcement of the Act into civil Lynch proceedings, a contemporary form of Lynch law carried out by college administrations, state actors, private nonprofit attorneys, and a network of coordinated OVW-funded administrative overseers.

60. In a civil Lynch proceeding, constitutionally protected interests of the accused, with the exception of his life, are subject to the same grave jeopardy by a mob of local VAWA coordinators and other extrajudicial authorities, whose actions are legally sanctioned by the Act, administratively supported, and financially incentivized by Defendant OVW.

61. For example, Defendant OVW jointly with Title IX enforcement agencies mandated colleges to use a lower standard of evidence than in criminal courts when adjudicating sexual assaults by stressing that adjudication is an educational experience, where students are found "responsible" rather than "guilty" so their processes should be different from the criminal justice system's.

62. In a civil Lynch proceeding on college campuses, labeled as an educational proceeding, the accused is not entitled to legal representation. While a government-funded quasi-prosecutor charges "National Crimes" against the accused, the accused must stand completely on his own, or bear the burden of property loss in paying private attorney, or risk complete annihilation of his

reputation, scholarship, education opportunities, and future employment opportunities, all of which are Constitutionally protected property interests.

63. The question of whether colleges should hear sexual assault cases in "kangaroo courts" is moot largely because they are required by the "Separate but Equal" federal law to act as a state actor and an agent and representative of federal government.

64. Outside academia Defendant OVW deliberately created and effectively maintained an even more Draconian infrastructure of civil Lynch proceedings in state and local governments.

65. Defendant OVW funded a network of VAWA coordinators in the administrative sections of the law enforcement agencies, state courts, and nonprofits. The network of VAWA coordinators, mostly white women, acted with extrajudicial authorities in governmental and private agencies with interlocking interests to enforce the "Separate but Equal" law.

66. VAWA coordinators discharged their extrajudicial authority during "pre-screenings" during intake processes, where they, by the very letter and spirit of the Act, determined domestic violence perpetrators by gender, cross-referred "victims" to OVW-funded private prosecutors and service providers, and denied the same services to male victims solely because of their gender.

67. The extrajudicial determinations of "guilt" of the accused and eligibility of

the "victim" for OVW program services carry the force of a federal law with no mechanism for the accused to appeal.

68. For example, through inter-agency coordination and cross-referrals, VAWA coordinators in the state prosecutor's office administered Victims' Compensation Assistance Program ("VCAP") funded by federal and state funds, in which "victims" are provided with cash assistance before a conviction of a crime.

69. With federal sanctions and federal dollars flooding into the state proceedings, civil Lynch proceedings have thrived in family courts nationwide.

70. Defendant OVW through its "Court Training and Improvements Program" and other federal funding mandates commandeered state family courts to encourage civil convictions of the accused by preponderance of evidence. Often the accused persons went *pro se* when charged with "National Crimes" in closed-door proceedings where OVW-funded private prosecutors trumped the accused persons on behalf of extrajudicially designated "victims" by the court's own administrative overseers.

71. Defendant OVW and its grantees financially incentivized case loads and convictions by private prosecution of "National Crimes" often disregarding due process protection, wrongful convictions, and other violations of civil rights mandates. Under the federally mandated lower standard of proof local courts maximized civil Lynch convictions of "pre-screened" defendants without evidence

20

or contrary to evidence.

72. In high numbers of extreme cases nationwide, law-abiding taxpayers were removed from their homes and children under the darkness of night by *ex parte* orders issued for charges of "National Crimes" to which they never had an opportunity to respond, their reputation, employment prospect, properties, and natural familial bounds with their children, destroyed forever.

### Noted Cases of Civil Lynching

73. The draft of VAWA came together in the aftermath of the 1991 Clarence Thomas hearing, where Professor Anita Hill alleged she faced sexual harassment by Supreme Court nominee Clarence Thomas, an African American, who described the civil proceeding in the U.S. Senate as a "high-tech lynching".

74. The enactment of the Act in 1994 as part of an omnibus federal crime bill occurred in the immediate aftermath of Nicole Simpson's murder by O.J. Simpson, an African American football player and a celebrity. O.J. Simpson's acquittal in 1995 sent the entire nation into emotional hysteria on the topic of (an African American football player's) violence against a white woman.

75. In September 1994, the same month VAWA was enacted, Christy Brzonkala, a white female college student athlete, alleged that she was gang-raped by Antonio Morrison and James Crawford. Both Morrison and Crawford are black and were college football players. Neither man was ever charged with a crime.

21

Crawford produced an alibi witness; Morrison said the sex was consensual.

76. Using private attorneys as private prosecutors Brzonkala exercised her private right of action under Section 13981 of the Act to sue Morrison. Although the Supreme Court of the United States eventually ruled in favor in *Morrison*, Brzonkala's accusations left a permanent scar on Morrison's reputation.

77. David Paxton, Morrison's attorney, wrote that "[h]is good name has been completely trashed… convicted of something he never did."

78. Morrison suffered from civil lynching in those proceedings. Like Ida B. Wells Morrison's mother maintained that Morrison was treated unfairly being black.

79. On October 15, 2016, Nikki Yovino, a white female college student, alleged that she was gang-raped by fellow college students Dhameer Bradley and Malik St. Hilaire. Both Bradley and St. Hilaire are black and Bradley was a college football player. Both men admitted having sex with Yovino, but said it was consensual.

80. Fortuitously, Nikki Yovino chose to report to the police rather than the college administration. Following the due course of law the police initiated a traditional law enforcement investigation.

81. When the detective questioned Yovino at her home she, according to the officer, "…admitted that she made up the allegation of sexual assault against (the football players) because it was the first thing that came to mind and she didn't want

to lose (another male student) as a friend and potential boyfriend," according to the arrest warrant affidavit: "She stated that she believed when (the other male student) heard the allegation it would make him angry and sympathetic to her."

82. On August 24, 2018, Yovino was sentenced to one year for her false rape allegations.

83. Although Bradley and St. Hilaire were ultimately exonerated under traditional police procedures and judicial proceedings, both were concurrently subject to civil Lynch proceedings under VAWA. The college administration was required by Defendant OVW and Title IX enforcement agencies to conduct its own "kangaroo court" hearing based on Yovino's October 15, 2016's allegations against the two black men.

84. Within three days from Yovino's initial false allegations, on October 18, 2016, both Bradley and St. Hilaire were suspended academically, barred from the campus, with Bradley's football scholarship taken away.

85. Male students of other races and ethnicities on college campuses were also subject to similar proceedings for sexual assaults. Men of all races and ethnicities in domestic relationships were subject to civil Lynch proceedings in local domestic violence courts under the "Separate but Equal" principles embodied in the Act.

86. Indeed, civil Lynch proceedings became a popular choice in handling sexual assault allegations in workplaces. When Judge Brett Kavanaugh was

nominated for a post on the Supreme Court of the United States, allegations of sexual assaults quickly emerged. The "high-tech lynching", as Justice Clarence Thomas coined the term in 1991, entered the age of smart phones and social media mobs.

87. Like Carolyn Bryant, the chief accuser of Judge Brett Kavanaugh, Dr. Christine Blasey Ford, never reported the supposed crimes to local law enforcement, nor did she attempt to prosecute them following normal channels, despite the fact that the criminal statute of limitations had not expired. [6]

88. Julie Swetnick was Kavanaugh's third accuser. Swetnick implied that Kavanaugh was involved with gang-rapes.

89. Angered by Kavanaugh's presumed guilt, various mobs flooded the streets, occupied the Senate office building, caused frequent disruptions in the hearing room, and cornered the committee members in the close spaces of hallways and elevators.

90. The nation witnessed the mob justice stampeding over one of the most sacred principles in the American criminal justice system, holding that a defendant is innocent until proven guilty.

91. For 25 years since the enactment of the "Separate but Equal" law and in

---

[6] It is entirely unclear whether a judicial confirmation proceeding in the Senate is a political process or a judicial process. If it is a political process, slanders and libels become a part of politics and can be considered fair play. If it is a judicial process, presumed innocence until proven guilty remains a due process right to all, including federal judges. Regardless, numerous members of the Senate Judiciary Committee publicly labeled the confirmation proceeding as a job interview and declared to the nation that the due process protection does not apply in a job interview.

the name of prosecuting "National Crimes", Defendant OVW and its grantees deliberately removed Plaintiffs' due process protection guaranteed in the American criminal justice system in much the same manner as described by Ida B. Wells.

92. Through federal taxation Defendant OVW and its grantees deliberately financed and instituted civil Lynching proceedings, i.e. employing of private prosecutions of class plaintiffs for the purpose of depriving them of their constitutionally protected rights and privileges without due course of law.

## ALLEGATIONS SPECIFIC TO PLAINTIFFS

### Delaware's Cooperative Federalism:
### Interlocking Entities of Civil Lynching

93. Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set forth herein.

94. State of Delaware's FFY2014-FFY2016 S.T.O.P. Violence Against Women Implementation Plan is a 142-page document of Defendants' *modus operandi* under the cooperative federalism. See Exhibit A.

95. To surrender its state sovereignty to the "Separate but Equal" federal law Delaware enacted Title 11 Chapter 87, § 8700-8709.  The state law created a state agency Criminal Justice Council ("CJC") in charge of the administration of OVW grants, which is guided by VAWA Implementation Committee ("Implementation Committee").

96. To secure the role and responsibility of the federal government in

enforcement of a federal law against "National Crimes" Title 11 Chapter 87, § 8700-8709 requires the United States Attorney for the District of Delaware as a member of the state agency. The state law also requires the Chief Judge of the United States District Court for the District of Delaware, or his/her designee, as a member of the state agency. See Exhibit B.

97. The purpose of the Implementation Committee is to "ensure the appropriate use of federal funds received under the Violence Against Women Act" and to "draw on the collective experience of individuals and agencies (*both private/non-profit and governmental*) to strengthen…coordinated approach to address the problem of violence against women."

98. In compliance to the letter and spirit of the Act the Implementation Committee explicitly emphasized the gender-activated eligibility for "the programs, laws, and policies Delaware has established to protect *female* victims [from] violent crimes". The CJC and its Implementation Committee explicitly exclude male victims solely because of their gender.

99. Governmental actors, in whose capacities individual defendants acted in implementation of the "Separate but Equal" federal law, include but are not limited to the City of Wilmington Police Department, the Delaware State Police, the Victims' Rights Task Force, the Domestic Violence Task Force, the Delaware Department of Justice, the Family Court of Delaware, and the Domestic Violence

26

Coordinating Council ("DVCC"). See Exhibit C.

100. To coordinate its surrender of state sovereignty to the "Separate but Equal" federal law Delaware also enacted Title 13, Chapter 21 § 2102 Domestic Violence Coordinating Council ("DVCC"), which is a state agency led by a similar set of governmental chiefs and coordinators designated in CJC. DVCC is exclusively focused on coordinating the "Separate but Equal" enforcement of the Act and the Defendant OVW's rules, regulations and policies. DVCC co-administered OVW grants. See Exhibit D.

101. Private actors, in whose capacities individual defendants enriched themselves from federal grants through unlawful means, include but are not limited to the Delaware Coalition Against Domestic Violence ("DCADV"), CLASI, DVLS, and Legal Services Corporation of Delaware, Inc. ("LSCD"), Child Inc., and People's Place II, Inc. DCADV is the private coordinating agency of private actors. See Exhibits E and F.

102. DVCC and DCADV represented a statutorily mandated government-private partnership in forging a web of interlocking interests, void of independence and impartiality, which permeated the criminal justice system, civil proceedings, and the local enforcement of the Act and Defendant OVW's rules, regulations and policies.

103. CLASI and DVLS are the primary providers of "Domestic Abuse Legal

Services". See "CLASI" in Exhibit D.

104. Under the "Separate but Equal" federal law "Domestic Abuse" literally equates "Violence against Women" only. CLASI and DVLS are funded by Defendant OVW to function as private prosecutors of "National Crimes".

105. Child Inc., People's Place II, Inc., and other nonprofit grantees of OVW are victim service organizations. Victim service organizations are financially incentivized by the quantity of services to predetermined "victims".

106. Through coordinated cross-referrals individual defendants from DVCC, DCADV, and its members, governmental or private, including but are not limited to Hamilton, Gorodetzer, and unnamed VAWA coordinators, routinely conduct extrajudicial functions of "pre-screenings" of designating "victims" versus "perpetrators" through "intake" processes, which appears to have evaded regulatory oversight.

107. Many of class plaintiffs who were found innocent of "National Crimes", including Chang and Smith, were "civilly convicted" by "pre-screeners" without due process of law.

108. Many of class plaintiffs who are real victims of domestic violence, including Chang, were apparently "pre-screened" out of OVW-funded program services solely because of their gender.

109. Governmental data with regard to all perpetrators, real or wrongfully

convicted, their victims, governmental or private prosecutions of the perpetrators, and related victim services are collected and tabulated into Defendant OVW's Biennial Reports to Congress.

110. Relying on APA Plaintiffs assert the detailed governmental data related to Defendant OVW's Biennial Reports to Congress are judicially reviewable because (a) the Act exceeded constitutional boundaries; (b) the enforcement of the Act is discriminatory; and (c) the enforcement of the Act and the collection of enforcement data are funded through federal taxation therefore public records.

111. By information and belief, the unlawful extrajudicial authorities, *modus operandi*, and secretive standards to designate Chang and Smith in domestic relationship or other similarly prosecuted persons on college campuses as perpetrators of "National Crimes" are direct and proximate results of the "Separate but Equal" federal law, and Defendant OVW's rules, regulations, and policies. The Act and its discriminatory enforcement under the cooperative federalism are judicially reviewable under the Constitution and APA.

### Private Prosecutors' Financial, Operational, and Legal Collusions in Civil Lynching

112. Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set forth herein.

113. On the surface, CLASI, DVLS and LSCD appeared to be three independently operated nonprofit legal service organizations, when in fact they are

financially, operationally, and legally colluded.

114. In July 2010, Office of the Inspector General ("OIG") issued its Audit Report GR-70-10-005, which identified $829,340, or 93 percent of OVW grant awarded to CLASI as "unsupported and unallowable expenditures". See Exhibit G.

115. Behind the scene CLASI concealed an extensively negotiated distribution formula contained in an agreement among itself, DVLS, and LSCD.

116. The first possible motive of keeping the formula from OIG is to avoid compliance audit requirement for the other two OVW grantees, DVLS and LSCD.

117. Indeed, the three OVW grantees shared another secret distribution formula for funds obtained from another funding source, Combined Campaign for Justice ("CCJ"). See Exhibit H.

118. The second possible motive of keeping the two formulas secret from OIG is to hide the joint financial interest of the three legal practices from other litigants.

119. Operationally, any requests statewide for free "Domestic Abuse Legal Services" or any free legal services from the three nonprofits went to DVLS for pre-screenings. See Exhibit I.

120. On its recruitment brochure DVLS states that "we coordinate the PFA Pro Bono Program in which an attorney signs up to represent financially eligible victims of domestic violence in obtaining a Protection From Abuse Order. DVLS also administers the "Legal Help Link" which refers potential clients with the

appropriate agency." PFA means Protection From Abuse.

121. "Legal Help Link" is the statewide contact numbers for any residents, like Chang and Smith, who sought for free legal services from the three nonprofits, including LSCD. See Exhibit J. Note "PERSON IN CHARGE" as Janine N. Howard-O'Rangers, Executive Director of Defendant DVLS.

122. DVLS as an OVW-funded private prosecutor and the operator of "Legal Help Link" possesses a monopolistic form of extrajudicial authority to determine which caller is a victim of domestic violence and the extrajudicial authority to presume who is the perpetrator of "National Crimes". Pursuant to the Implementation Committee's explicitly stated objectives that Delaware's programs, laws, and policies are established to "protect *female* victims [from] violent crimes", DVLS routinely designate men like Plaintiffs Chang and Smith as perpetrators from the intake solely based on their gender.

123. DVLS' extrajudicial authority, sanctioned by governmental authorities in CJC, DVCC, and DCADV, carries the force of law and cannot be appealed. In practice, once DVLS determined someone like Chang and Smith to be perpetrators, the accused became the subject and target upon which the entire web of interlocking VAWA entities would unleash its draconian powers to infinity, even though they were not convicted in a judicial hearing.

124. In helping their "pre-screened" clients in obtaining PFA Orders from the

31

Family Court of Delaware, DVLS and CLASI routinely conducted civil lynching of "pre-determined" perpetrators like Chang and Smith with a commissioner who personally donated to the same OVW-funded private prosecutors.

125. The "pre-determined" perpetrators like Chang and Smith had to appeal a PFA hearing decision to a state judge who personally donated to the OVW-funded private prosecutors.

126. The "pre-determined" perpetrators like Chang and Smith had to appeal a PFA hearing decision to a state supreme court justice who also personally donated to the OVW-funded private prosecutors.

127. The "pre-determined" perpetrator like Chang and Smith had to sue state actors in the district court for violations of their civil rights and but to be dismissed by a district court judge who also personally donated to the OVW-funded private prosecutors.

**Common Genesis of Plaintiffs Chang and Smith's**
**Failed Civil Rights Litigations in the District Court for the District of Delaware**

128. Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set forth herein.

129. As direct and proximate effects and results of the "Separate but Equal" Act and Defendant OVW's *de facto and de jure* discriminatory rules, regulations and policies, Plaintiffs Chang and Smith have been and continue to be subject to civil Lynch proceedings administered by statutorily-coordinated and federal-state

cooperated OVW grantees, both governmental and private.

130. Plaintiffs re-allege and incorporate by reference their allegations in 1:14-cv-01066-GMS and 1:15-cv-00963-LPS as though fully set forth herein. At all relevant times Smith did not committed the alleged act(s) of domestic violence. At all relevant times Chang is in fact a victim of domestic violence.

131. At all relevant times mentioned herein, Defendants Gorodetzer of DVLS and James McGiffin ("McGiffin") of CLASI, in coordination with all other OVW-grantees, including but not limited to "Legal Help Link" of Widener Law School, extrajudicially determined Plaintiffs to be "perpetrators" of "National Crimes", which unlawfully created the common genesis of subsequent violations of Plaintiffs Chang and Smith's civil rights.

132. By information and belief, Defendants designated Smith as a violent domestic abuser in and around January 2009 and they designated Chang the same evil character between August 2012 and October 2012. The extrajudicial determinations were based on intentionally fabricated allegations.

133. Between October and November of 2012 and as a domestic violence victim, Chang contacted "Legal Help Link" of DVLS/Widener Law School and sought assistance. Defendant DVLS refused to assist Chang solely because of his gender. Court records and case files in Defendants' possessions showed that Chang was subject to multiple domestic assaults with his children present at the scenes.

134. At all relevant times mentioned herein, Defendants Hamilton of WPD and Owen of Delaware State Police, in their OVW-funded VAWA coordinator capacity, extrajudicially provided multiple OVW program services to "victims" of Chang and Smith, financially or otherwise, including nine arrests of Plaintiff Smith by Delaware State Police and attempted arrest of Plaintiff Chang by WPD.

135. Defendants Hamilton and Owen, in coordination with Defendant Patricia Lewis ("Lewis" in Exhibit C), an OVW-funded government prosecutor, extrajudicially provided VCAP assistance to "victims" designated by OVW-funded private prosecutors DVLS and CLASI.

136. VAWA provision in 8 U.S.C. 1367(a) lets certain immigrants receive VAWA-specified government benefits by making a "prima facie" allegation of domestic violence, an allegation that the accused citizen is expressly forbidden to rebut, as long as the allegations are sufficiently specific as to constitute a "prima facie" case, which is the legal term for allegations, regardless of their truth or falsity, which are sufficiently detailed and internally consistent to adequately allege a legal violation. Under VAWA, the federal immigration agency deems a U.S. citizen, like Plaintiff Chang, accused of domestic violence to be a "prohibited source." So in Kafka-esque manner, a federal agency must refuse to accept any documentation that might reveal the alleged immigrant victim to be a criminal, welfare cheat or perjurer under VAWA.

137. Defendant McGiffin privately prosecuted Smith in four separate civil Lynch proceedings. Smith was subjected to five PFA orders issued by co-Defendant the Family Court of Delaware, each of which stipulating no contact with Smith's two young sons. Twenty-one domestic violence charges and nine arrests, including a 24-hour solitary confinement in Delaware's maximum-security prison, ensued.

138. Plaintiff Smith's nine arrests by Delaware State Police and other police agencies gave rise to his civil rights complaint, which was dismissed by Chief Judge Sleet (from 2007 to 2014) of the District Court, who was a fellow member of the state agency CJC with the very state defendants. See Exhibits A and B.

139. For his eight-year ordeal Smith was able to obtain, by acting *pro se* against an unlimited prosecutorial machine funded by the "Separate but Equal" Act, was a pardon letter signed by Governor John Carney in April 2017. See Exhibit K. The pardon board and the governor's legal counsel were apparently convinced that Smith has been innocent to begin with.

140. At all relevant times mentioned herein Defendant Gorodetzer and DVLS knew that their pre-screened "victim" purportedly assaulted by Plaintiff Chang was a real and repeat domestic violence perpetrator against Chang and his children. Yet, for the purpose of perpetuating their unlawful and extrajudicial determinations Defendants, private and governmental, engaged in a public-private partnership of malicious prosecution of Chang.

141. Defendant Gorodetzer, an OVW-funded private prosecutor of "National Crimes", knowingly administered a false sworn affidavit with a government representative of an OVW-funded state agency. See D.I. 15 Exhibit B of 1:15-cv-00963-LPS.

142. Then, a government prosecutor under Defendant Lewis took over the baton from the private prosecutor Gorodetzer and carried out a malicious prosecution of Plaintiff Chang.

143. The malicious prosecution gave rise to Plaintiff Chang's civil rights complaint, which was dismissed by Chief Judge Stark (from 2014 to present) of the District Court, who is also a *de facto* member of the state agency CJC with the very state defendants. See Exhibits A and B.

144. At all relevant times mentioned herein, Chief Judge Stark made multiple personal and financial donations (Exhibit H) to the OVW-funded private prosecutor, Defendants DVLS, which is already in multiple collusions with Defendant CLASI, LSCD, and other OVW-grantees, governmental and private.

145. Chang and Smith's failed civil rights litigations in the District Court for the District of Delaware proved a shocking effect of the "Separate but Equal" Act and its "cooperative federalism" -- the very rules, policies, procedures and methods of VAWA enforcement adopted by federal and state agencies under the aegis of the Court are being challenged and the Court is being asked to pass judgment on the

wisdom of decisions made under its oversight. This blending of the prosecutorial power with the judicial power is something that occurs in other countries but not in this country. In our democracy there is a strict division of powers, and the very image of a federal court participating in the prosecution of a case before itself is anathema to the American system of justice.

146. At all relevant times mentioned herein, Defendant the Family Court of Delaware is an OVW-grantee and a member of CJC and DVCC. It retains exclusive jurisdiction on criminal and civil proceedings related to enforcement of the "Separate but Equal" Act. Its members routinely made personal and financial contributions (Exhibit H) to OVW-funded private prosecutors, Defendants DVLS and CLASI, and vested their interests, governmental, personal and financial, into each and every extrajudicial determination unlawfully made by Defendants DVLS and CLASI.

147. At all relevant times mentioned herein, extrajudicial determinations of "guilt" by Plaintiffs Chang and Smith, and malicious prosecutions thereafter by government prosecutors or private prosecutors alike, shared one common evil objective, i.e. to separate children from their law-abiding tax-paying parents solely because of the gender of the parents.

148. Defendants Vari and Hitch routinely and irreversibly severed ties betweens children and their non-offending parents solely because of the gender of

the parents.

149. Defendant Vari ordered no contact between Plaintiff Smith and his children when Defendant McGiffin, an OVW private prosecutor, commenced the initial civil Lynch proceeding against Smith who was compelled to defend himself of "National Crimes" of domestic assaults without legal representation.

150. The only venue Smith could have any contact with his two sons was at Defendant People's Place II (Exhibit F), who is an OVW-grantee operating "supervised visitations" of "perpetrators" designated extrajudicially by Defendants McGiffin of CLASI and other VAWA enforcers.

151. The pronounced objective of private and governmental prosecutions of Plaintiff Chang by DVLS, WPD, and other OVW grantees, as shown in D.I. 15 Exhibit B of 1:15-cv-00963-LPS, is to permanently separate a U.S. citizen from his children, also U.S. citizens, on the U.S. soil.

152. The only venue Chang could have any contact with his three children was Defendant Child Inc. (Exhibit F), who is an OVW-grantee operating "supervised visitations" of "perpetrators" designated extrajudicially by Defendants Gorodetzer of DVLS and other VAWA enforcers.

153. In support of Defendant DVLS/"Legal Help Link" and Gorodetzer's extrajudicial authority under the "Separate but Equal" Act, and to fulfill their shared governmental, personal, financial, and academic interests with Defendants DVLS

and "Legal Help Link", Defendants Hitch, Mark Buckworth, and Chandlee Kuhn of the Family Court repeatedly rejected Plaintiff Chang's petitions to see his children.

154. In three separate rulings issued by Defendants Hitch and Buckworth, the latter of whom made multiple personal and financial donations to Defendants DVLS and CLASI, Plaintiff Chang was compelled to pay DVLS legal fees in thousands.

### Allegations of Predicate Acts by Private and Individual Defendants under Federal and State RICO Statutes

155. Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set forth herein.

156. Pursuant to pendant jurisdiction of this Court, 18 U.S.C. §§1961-1968, and Delaware's Title 11 Chapter 15 Organized Crime and Racketeering §§1501-1511, Plaintiffs request that this Court grant them leave to file RICO Case Statement under seal.

157. In their RICO Case Statement Plaintiffs further allege a pattern of racketeering activities through the affairs of an enterprise maintained by private actors and individuals, named and unnamed, under the "Separate but Equal" law and through civil Lynch proceedings since 2005 to present time.

158. Plaintiffs request that the Court, upon reviewing the alleged evidence, send a criminal referral to the criminal section of Department of Justice, or in the event where conflict of interest exists, appoint counsels to prosecute the alleged crimes.

159. Plaintiffs also request that the Court grant them leave to amend civil RICO claims against private actors and individuals responsible for racketeering activities under federal and state RICO laws.

## CLAIMS FOR RELIEF

### Count I Against All Defendants
### (Violation of the 14th Amendment)

160. Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set forth herein.

161. Pursuant to the "Separate but Equal" Act, its cooperative federalism under Title 11 Chapter 87, § 8700-8709, and the rules, regulations and policies promulgated by Defendant OVW, state defendants acted as the agent and representative of Defendants OVW and Sullivan, the federal defendants.

162. Both federal and state defendants knowingly and deliberately denied to Plaintiffs the equal protection of the laws.

### Count II Against All Defendants
### (Violation of the 4th, 5th, and 6th Amendments)

163. Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set forth herein.

164. Under the Act Defendants promulgated and instituted secret extrajudicial authorities nationwide to pre-determine "victims" for the sole purpose of deliberately seizing the accused persons' properties and other constitutionally

protected rights and privileges without due course of law, in violations of the 4th and 5th Amendments.

165. Under the Act Defendants promulgated and instituted a form of double jeopardy where a single stream of gender-neutral taxation funded both private and governmental prosecutions of class plaintiffs, who were held to answer for the same "National" or infamous crimes, in violation of the 5th Amendment.

166. Under the Act Defendants promulgated and instituted civil Lynch proceedings nationwide accusing class plaintiffs of committing "National Crimes" where the assistance of counsel for defense of the accused was deliberately removed to maximize convictions, in violations of the 6th Amendment.

### Count III Against OVW and Sullivan
### (Violation of APA and the 10th Amendment)

167. Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set forth herein.

168. Under the Act Defendant OVW promulgated and instituted secret extrajudicial authorities nationwide, produced multitude of fraudulent victims receiving OVW program services, and tabulated fraudulent cases and submitted to Congress in its Biennial Reports. OVW program services are entirely funded by taxpayers and therefore all records with regard to are subject to judicial review under APA.

169. The cooperative federalism under the Act, as exemplified in Delaware's

Title 11 Chapter 87, § 8700-8709, the blending of the prosecutorial power with the judicial power, the blending of federal power with state power, and the rules, regulations and policies promulgated by Defendant OVW violated the 10th Amendment and APA, and are therefore subject to judicially review.

### Count IV Against OVW and Sullivan
### (Violation of the Tucker Act)

170. Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set forth herein.

171. Class plaintiffs were subject to unlawful federal taxation in funding the "Separate but Equal" Act that Defendants OVW and Sullivan enforced with *de facto* and *de jure* discriminatory force, by which class plaintiffs were intentionally deprived of government services, either as a defendant of "National Crimes" or as a real victim of domestic violence.

172. The taxation without representation scheme of the Act and its enforcement gave rise to class plaintiffs' constitutional claims under the Tucker Act, particularly taking of property by the government with no intention to provide related government services.

### Count V Against All Defendants
### (Common Law Violations)

173. Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set forth herein.

42

174.  Plaintiffs re-allege and incorporate by reference their allegations in 1:14-cv-01066-GMS and 1:15-cv-00963-LPS as though fully set forth herein. Defendants engaged in conducting wrongful arrests, conspiring wrongful arrests, falsifying police reports, administering false affidavits, and signing orders of unlawful seizures of properties.

175.  Defendants initiated the private and governmental prosecutions of Plaintiffs, did so without probable cause and acted with apparent gender-based discriminative motives and purposes.

176.  Defendants investigation and initiation of prosecutions against Plaintiffs were based on impermissible gender factors under the "Separate but Equal" Act.

177.  Plaintiffs suffered a deprivation of liberty, properties, association with their children, reputation, and other constitutionally protected interests as a result of Defendants' deliberately coordinated unlawful actions.

## RELIEF REQUESTED

WHEREFORE, Plaintiff prays that this Court issue as ORDER:

a. Declaring that the Act in plain reading is discriminatory and violates the 14th Amendment; Congress exceeded its authority when enacting the Act;

b. Declaring that the federal taxation in funding the enforcement of the Act discriminatory against the same taxpayers solely because of their

43

gender is taxation without representation and therefore violated class plaintiffs' property interest; Congress exceeded its authority when funding the Act;

c. Declaring that the Defendant OVW exceeded its authority and abused its enforcement powers by making and promulgating rules, regulations, procedures, policies, and customs, including but not limited to federalizing local crimes as "National Crimes" and promoting extra-judicial administration of guilt of such crimes, in violation of the 4th, 5th, 6th, and 14th Amendments;

d. Declaring that co-enforcement of VAWA and Title IX violated the rights and privileges of the accused under the 4th, 5th, 6th, and 14th Amendments;

e. Declaring that VAWA provision within federal immigration statutes violated the rights and privileges of the accused under the 4th, 5th, 6th, and 14th Amendments;

f. Declaring that Defendant OVW exceeded its authority and abused its enforcement powers in violating state sovereignty over local crimes, in violations of APA and the 10th Amendment;

g. Enjoining the Defendants as follows:

The class plaintiffs are under continuing threats of suffering from another arrest, another private or governmental prosecution, another wrongful eviction from their homes or colleges, another unlawful seizure of their vehicles, another expropriation of their properties in forms of fees to OVW-funded private prosecutors, another incarceration, and another loss of reputation and other constitutionally protected rights and privileges.

The Court has authority to issue an injunction that, prior to any meaningful amendment to the Act, Defendant OVW and its grantees immediately provides public defender services nationwide to any person accused of "National Crimes" under its cooperative enforcement of the Act.

h.  Awarding damages under the Tucker Act for deprivations of right to counsel and private attorney fees;

i.  Granting relieves requested in 1:14-cv-01066-GMS and 1:15-cv-00963-LPS.

j.  Granting Plaintiffs leave to file RICO case statement of predicate acts committed by private actors and individuals.

Respectfully Submitted,

Weih Steve Chang
122 Pumpkin Patch Lane
Hockessin, DE 19707

Gordon Gene Smith
1603 Taylorwood Drive
Port Orange, FL 32128

DATED:  April 29, 2019